## BABCOCK & WILCOX CO. v. SPRINGFIELD BOILER CO. et al.

(District Court, S. D. New York. August 26, 1925.)

1. **Patents** ⟨⟩328—1,141,520, claims 4, 6, 7, and 9, for superheater boiler, not infringed.

Bell Patent, No. 1,141,520, claims 4, 6, 7, and 9, June 1, 1915, for superheater boiler with constricted "pass" above furnace, held not infringed.

2. **Patents** ⟨⟩328—15,210 reissue for superheater boiler not infringed.

Pratt reissue patent, No. 15,210, October 18, 1921, for tube boiler with longitudinal and horizontal water tubes, a superheater having transversely extending bent tubes between water tubes, held not infringed.

3. **Patents** ⟨⟩138(2)—Defendants held not liable for infringement of reissue patent, in view of intervening rights.

Where one unit of structure alleged to infringe plaintiff's reissue patent was constructed at time of such reissue, and did not infringe plaintiff's original patent, defendants held not liable for infringement if established.

In Equity. Patent infringement suit by the Babcock & Wilcox Company against the Springfield Boiler Company and another. Decree for defendants.

Gifford & Scull, of New York City (Livingston Gifford, of New York City, C. P. Byrnes, of Pittsburgh, Pa., and George F. Scull, of New York City, of counsel), for plaintiff.

John E. Hubbell, of Philadelphia, Pa. (W. B. Morton, of New York City, of counsel), for defendant Springfield Boiler Co.

Briesen & Schrenk, of New York City (Fritz v. Briesen, of New York City, of counsel), for defendant Superheater Company.

KNOX, District Judge. [1, 2] In a competition with plaintiff for the contract to install a steam boiler plant in the power station of the United Electric Light & Power Company at Hell Gate, New York City, the defendants were successful. They proceeded to build and install several enormous superheater boilers at a cost of something like one and a quarter millions of dollars. The result of their labor is said, by plaintiff, to constitute an infringement of claims 4, 6, 7, and 9 of United States letters patent to Bell, No. 1,141,520, dated June 1, 1915, and of claims 1, 2, 4, and 6 of United States reissue patent No. 15,210, reissued to Arthur D. Pratt, on October 18, 1921. Both patents are owned by plaintiff:

The Bell claims read as follows:

"4. In a steam boiler, the combination

with longitudinally disposed upper and lower banks of tubes, of a transverse pass for the products of combustion having an upper restricted portion, and a superheater located in the lower large portion of said pass."

"6. In a steam boiler, the combination with longitudinally disposed upper and lower banks of tubes, of a transverse upward pass for the products of combustion, across the tubes having an upper restricted portion, a downward transverse pass across the tubes communicating with the upward pass and having a restricted lower portion, and a superheater located in the lower larger portion of the upward pass.

"7. In a horizontal water tube boiler, the combination with upper and lower banks of water tubes, of a furnace located below the same, transversely disposed baffles to cause the products of combustion to flow upwardly across the tubes, and a superheater arranged in one of the passes formed by the baffles, said pass being constricted above the furnace."

"9. In a horizontal water tube boiler, the combination with a substantially horizontal set of water tubes, of a furnace located below the same, oppositely extending transversely disposed baffles arranged across the tubes and producing up and down passes, one of said baffles having an offset to produce a constriction in the first pass, and a superheater arranged in the first pass and above the furnace."

The claims of the Pratt reissue patent here in controversy are:

"1. A water tube boiler having longitudinal water tubes, a superheater having transversely extending bent tubes between the water tubes, and baffling for directing the products of combustion, and baffling having a horizontally extending baffle above the lower water tubes to expose them to the flame and gases for the major portion of their length and an upwardly projecting baffle extending therefrom transversely of the water tubes, above the superheater and arranged to give the gases a restricted upward transverse pass across the water tubes located above the superheater.

"2. A water tube boiler having front and rear water compartments connected by longitudinal horizontally extending water tubes, a superheater having transversely extending tubes between the water tubes with bent portions within the setting, and baffling for directing the products of combustion, said baffling having a baffle extending in horizontal direction along the lower rows of the water tubes located above the superheater to

expose the water tubes below the superheater to the flame and gases for the major portion of their length, and an upwardly projecting baffle extending therefrom, transversely of the water tubes above the superheater and arranged to give the gases a restricted upward transverse pass across the water tubes located above the superheater."

"4. A water tube boiler having water compartments connected by longitudinal horizontally extending water tubes, a superheater having transversely extending tubes between the rows of water tubes and provided with bent or curved portions, and baffling for directing the products of combustion, said baffling having a horizontally extending portion among the water tubes over the superheater, and also having a portion extending upwardly and transversely of the water tubes above the superheater, said baffling forming an upward transverse pass for the gases which is narrower among the water tubes above the superheater than at the inlet to the water tubes below the superheater, the lowermost water tubes being exposed to the flame and gases for the major portion of their length."

"6. A water tube boiler having water compartments connected by longitudinal horizontally extending water tubes, a superheater having transversely extending tubes between the rows of water tubes and provided with bent or curved portions within the setting, and baffling for directing the products of combustion, said baffling having a horizontally extending portion among the water tubes over the superheater, and also having a portion extending upwardly and transversely of the water tubes above the superheater, said baffling forming an upwardly transverse pass for the gases which is narrower among the water tubes above the superheater than at the inlet to the water tubes below the superheater, and another baffle depending among the upper water tubes and extending transversely of them, arranged to give the gases another transverse down and up pass through said upper water tubes."

The application for the Bell patent was made upon December 26, 1905, and the application for the patent subsequently reissued to Pratt bears date October 8, 1915.

Defendants' alleged infringing boiler is of the double stoking horizontal type. It has two banks of water tubes—one below and one above a superheater composed of bent tubes which extend transversely of the water tubes. Six tiers of these latter compose the lower bank. They, together with the superheater and two tiers of tubes of the

upper bank, are swept with the full play of the flame and gases generated in the fire box. Immediately above the lower ends of the second tier of tubes of the upper bank, a baffle is to be found. It extends horizontally along the tier of tubes to a point a little more than midway of their length. It then rises at an oblique angle to its horizontal position, and transverses the remainder of the upper bank, which is composed of fourteen tiers of tubes. The products of combustion, once they have passed the first two tiers of the tubes of the upper bank are confined to a constantly diminishing area until they find room for temporary expansion at the uppermost tier of the bank. They then sweep over the top of the baffle described, and along a portion of the upper bank of tubes that has thus far been protected from their action. When they have progressed to about half of the remaining length of the uppermost tier of tubes, they come into contact with an angular baffle projecting downwardly from the roof of the boiler housing and being, for most of its length, substantially parallel with the upwardly extending baffle. Just before the downward baffle reaches the uppermost tier of tubes, its course is changed so as to cause it to transverse the five upper tiers in a little less than substantially vertical direction. The gases are thus forced downward through the narrowing pass formed by the vertically disposed angles until they are liberated to flow along the remaining length of the tubes composing the upper bank. Having done this, they reach an outlet pipe along and through the boiler's third pass. This is formed by the baffle extending downward from the roof and the boiler headers. For present purposes, the boiler headers may be designated as water compartments.

From the foregoing, it will be observed that the Hell Gate boiler is of a construction that may bring it within the reading of each of the claims of the Pratt reissue patent; and, if a liberal interpretation be given to the claims of the Bell patent in suit, the defendants' structure can be read upon them. The question as to whether such readings should be made, assuming the patents to be valid, necessitates some reference to the development of the present day boiler art.

In an endeavor to keep pace with the constantly increasing demand of utility companies for high-power boilers, requiring relatively small floor space, and possessing an overall efficiency that will enable them to meet the necessities of peak load electrical demand, boiler makers have dared and accomplished results that are little less than startling. With what appears to be perfect safety, the boilers of many power houses are to-day responding to the imposition of loads at which the engineer of twenty-five years ago would have stood aghast. The product of plaintiff's company has contributed its fair share to the development that has taken place. But all that has been done seems to have come to pass without assistance from either of the patents in suit. By this is meant that no boiler manufactured in accordance with the teachings of either invention was put into commercial use before the installation that is now asserted to constitute infringement. In extenuation of this fact, plaintiff says that boilers "cannot be sold unless customers will accept them. They are large, expensive power machines. Engineering concerns employed by purchasers to decide upon the type of boiler to be used were evidently afraid of the innovation. As * * * safety and reliability are the first prime essentials of a boiler, and as this new type had not been tested out, engineers were afraid to accept it."

As bearing upon the uncertainty as to what will be the performance of a new type of boiler, attention is directed to the avowed failure of a boiler made pursuant to Sewall patent, No. 772,435, also owned by plaintiff. Sewall was chief engineer for Babcock & Wilcox. He appreciated the desirability of providing a high-capacity boiler that would require a minimum horizontal space. Accordingly, he devised a steam generator comprising separate and complete superposed units or generators. In other words, he made a boiler that called for three banks of tubes, each with its own water drum. Between the lower unit of tubes and the one next adjoining, and in the path of the gases from the furnace, he placed a superheater. The lower bank of tubes was unbaffled. Parenthetically, it is plaintiff's argument that the Sewall structure called for three boilers stacked one over the other. In a sense this is true. Notwithstanding, the completed structure was unitary, and was intended to perform the functions of a boiler. That it was so regarded by plaintiff is evidenced by the fact that contracts were made to supply at least eight such boilers to customers. They were not supplied, because an experimental test of a modified form of the Sewall boiler, equipped with one of the water circulation means devised by the inventor, produced water hammers, together with some other circulatory difficulties. For this reason, plaintiff's customers, who had ordered

Sewall boilers, were supplied with the standard form boilers. Whatever may have been the defects of Sewall's circulatory system, they do not appear to have been insurmountable. At any rate, plaintiff's expert is authority for the statement that the difficulty would have been overcome had the separate water drums, one for each bank of tubes, been placed at the top of the structure, with proper connections to a continuous header. If that were done, the obvious arrangement of the banks of water tubes, said the expert, would have been to place them close together. There would then be something very similar to what is shown by the models of the boilers here in controversy. But, as was pointed out, these things were not done. Even so, the apparent failure of the Sewall boiler, serious though it was, does not discredit his arrangement of a superheater placed over an unbaffled bank of water tubes. That is now recognized as an advantageous position, and, in view of the conservatism that then characterized the boiler art, was a daring innovation. To quote from plaintiff's brief:

"In 1905, all boiler engineers were afraid of exposing the lower water tubes of a horizontal water tube boiler for all or the major portion of their length. They were all afraid that the lower tubes would burn out. Bell undoubtedly feared this, and for that reason, he showed, in his preferred forms, the protection of the lower water tubes for a part of their length by the roof baffle portion of his angle baffle. Pratt dared to do the thing which Bell feared, namely, to expose the lower water tubes to full firing for their full length, and yet he retained all the advantages of Bell and added others."

Subsequent developments in the art have shown that there was no lack of feasibility and practicality in Sewall's idea of generating steam by subjecting the water tubes of the lower bank of his boiler to the unbaffled products of combustion, and of obtaining a higher degree of superheat than had theretofore been obtained through the revealed arrangement of his superheater. Very probably it was the excellent operation of this feature of his discovery that produced the deficiencies in the operation in the circulating system. Perhaps "the water level in the lowermost drum from which the steam was taken from the two boilers was very erratic," because of the fact that the boiler made superheated steam so quickly and efficiently that its circulating system was not sufficient to keep the device from "boiling over" or "boiling dry."

In answer to plaintiff's contention that Pratt, rather than Sewall, should be regarded as a pioneer in respect to the position at which a superheater should be placed in a high-rating boiler, it may be said that, if Sewall's disclosure is to be held a failure, there was no certainty that Pratt's boiler would be a success until defendant built the structure that is said to infringe. This is to recall that no boiler of the so-called Bell-Pratt type ever went into operation before the erection of the Hell Gate structure. The practical step in advance, as distinguished from one that existed only in theory, was made by defendants. As bearing upon the bestowal of credit for such advance, plaintiffs, by way of argument, charge defendants with having copied the design of the Hell Gate boiler from the plans and specifications attached to plaintiff's bid. No testimony offered on the trial tended to support conduct so reprehensible. Undeniably, there are certain points of similarity between the boiler shown in plaintiff's bid and that erected at Hell Gate. There are also a number of points of differentiation. One of the most important of these is that plaintiff's proposal was for a boiler equipped with a standard U tube superheater, with the tubes parallel with the water tubes.

With respect to the charge of copying, plaintiff argues that it was not given an opportunity to examine any of defendants' officers and agents upon the subject. A sufficient reply is that no issue touching the matter was tendered to defendants in plaintiff's complaint. Had a theft charge been made, some answer would doubtless have come from defendants. Whether the answer would have been good or bad cannot now be told. But, in the absence of such charge and answer and supporting proof, the court cannot draw the conclusion that it is asked be reached from the similarities between plaintiff's proposal and defendants' structure. Findings of such serious import must be founded on something more substantial than the surmise and suggestion of counsel put forth in argument at the close of a warmly contested trial.

When Pratt applied for patent 1,206,246, of which his patent in suit is a reissue, his principal thought seems to have been to secure protection upon a new form of superheater, which should be located within a bank of water tubes. The superheater was particularly differentiated from those of the prior art in that its tubes were bent or bowed more or less either at tangents or so

that their center lines approach the arc of a circle. This was the distinguishing feature. For example:

Figure 5 of the patent drawings "is a partial plan view and partial horizontal section of a boiler set in a plant with additional boilers of the same type to illustrate the saving in space between the boilers by the use of surved superheater tubes."

One of the contemplated advantages of the use of curved tubes was that, "under the high temperatures to which the tubes of secondary superheaters are subjected, the tubes are likely to spring or to become distorted * * * the bending (curves) enables them to expand and contract within their length by bowing more or less without pushing on the headers as they would if they were straight."

Also "an advantage of using tubes bent so that their center lines approach the arc of a circle is that they can be withdrawn from the sides of the superheater in locations where there is a comparatively narrow passage between the boilers. * * * If straight tubes had been used, it would have been necessary, for the removal of the tubes, to make the passages between the boilers practically as wide as the length of the tubes. This would make any such superheater impractical in the modern boiler room equipped with large size units. The superheater tubes, being in the arc of a circle, can be withdrawn into a passage of slightly less than ten feet."

The specifications further say:

"It will be noted that the superheater tubes may be drawn out and replaced through the superheater headers, this being a highly desirable feature. It will also be noted that the superheater tubes are exposed to the action of the hot gases throughout their entire length from face to face of the superheater boxes, while at the same time the tubes may be readily removed and replaced; also that the superheater headers or boxes or portions of them form part of the superheating surface."

Aside from the use of the word "bent" in some of his claims, Pratt does not suggest, let alone declare, that tubes of a shape other than his curved form will perform the functions attributed to the latter.

When, by his own statement, Pratt admitted that the use of straight tubes in a superheater would make the same impracticable in modern boiler rooms, and when, apparently, he never thought that the same result might possibly be obtained through the use of half lengths of substantially straight tub-

ing arranged in the shape of a horizontal W, as is used in the Hell Gate superheater, it seems to be going a long distance to give him domination over the future development of an important art, merely because he was fortunate enough to get allowed certain claims that are broader than his disclosure. Further evidence that the word "bent" should not be construed to cover all bends in a superheater tube is to be found in the fact that Pratt refers to the standard form of U tube superheater. In his application, such device is called the primary superheater. Having chosen a particular form of a bent tube, and having made no patentable disclosure as to any other, he should be confined to the limitation imposed by his specification. If this be done, the shape of the tubes of the alleged infringing superheater is not within any of the claims of the Bratt reissue. They do, however, extend transversely of the water tubes. But, aside from the ease with which the tubes may be removed, that arrangement serves no novel function. Substantiation for this statement is to be found in the testimony of plaintiff's expert. In the course of his examination, he was asked:

"Does it, or does it not make an essential difference whether the legs of the superheater units extend parallel to the water tubes or transversely to the water tubes?"

The answer was:

"So far as superheat control, or superheat itself, gas flow, gas distribution, is concerned, in my opinion, it makes no difference."

The remaining feature of the Pratt claim that has not been discussed is the arrangement of the baffling. That there was any particular merit and advantage in the arrangement of the baffles with respect to the superheater is not claimed in the original application. Proceedings looking to the surrender and reissuance of the Pratt patent were begun on May 14, 1921. This was about two months after defendant had begun the erection of the infringing boilers, and two months prior to the completion of the installation of one of them.

Between the date of the application for patent No. 1,206,246 and May 14, 1921, Pratt applied for patent No. 1,274,327, issued July 30, 1918. He then said:

"The present day tendency is toward higher superheats and one of the objects of my invention is to meet this condition, in a standard type of boiler, by placing the superheater in a zone of higher gas temperature. In the Standard Babcock & Wilcox boiler, the superheater is placed above the bank of boiler tubes where, for a given boil-

er, there is substantially a constant gas temperature. According to the present design, the superheater is placed below the bank of boiler tubes, and a sufficient number of water tubes are placed below the superheater in order to minimize heat absorption in the latter through radiation from the fire and hot furnace walls."

He also gave an arrangement of baffles that made three transverse passes across his tubes. The lower bank of water tubes and all of the superheater, with the exception of the boxes, were located below his horizontal baffle. It extended outwardly from the furnace wall at a point immediately below a single tier of water tubes immediately above the superheater. The length of the baffle was about half way of the length of the water tubes. It then met at an oblique angle an upwardly extending baffle that reached the top of the upper bank of water tubes.

Another baffle projected downwardly at an oblique angle from the boiler housing. It made contact with the top tier of the upper bank of tubes at a point a little more than midway of the upwardly extending baffle and rear end of the housing. From there it descended at right angles across all but two of the upper bank of tubes, thus forming a three-pass boiler. Before proceeding further, attention should be called to the fact that the portion of the boiler within which the superheater is located was called "the secondary combustion chamber."

Accompanying the application for this patent were a number of claims that covered a structure substantially the same as the infringing boilers.

"2. A water tube boiler having horizontally extending tubes connected to lower and upper headers, a furnace, the lowermost rows of tubes being exposed substantially their full length directly over the primary combustion chamber, a secondary combustion chamber above the lowermost tubes, a bank of generating tubes above the secondary combustion chamber, and a superheater in the secondary combustion chamber.

"3. A water tube boiler having horizontally extending tubes connected to lower and upper headers, a furnace, the lowermost rows of tubes being exposed substantially their full length directly over the primary combustion chamber, a secondary combustion chamber above the lowermost tubes, a bank of generating tubes above the secondary combustion chamber, baffles dividing said bank of tubes into a plurality of transverse passes, and a horizontally extending baffle supported on the lowermost row of tubes of

said bank and extending to the first of said transverse baffles."

"8. A water tube boiler having horizontally extending tubes connected to lower and upper headers, a furnace, said tubes being divided into three groups, the lowermost of which is directly over the primary combustion chamber and exposed substantially their full length to the hot gases, a main bank of tubes and a group intermediate the lowermost tubes and the main bank, and separated from both, a plurality of baffles dividing the main bank into transverse passes, a baffle extending from the lower headers and supported on an intermediate group of tubes and extending to the first of said transverse baffles, the space between the lowermost group and the middle group of tubes constituting a secondary combustion chamber, and a superheater in the secondary combustion chamber."

The foregoing claims were rejected on French patent, No. 364,580, and Sewall, No. 772,435. The patentee then canceled the rejected claims, and thereafter the patent issued with claims that are not here claimed to be infringed by defendants. It is the contention of the latter that, in the reissue patent in suit, Pratt has attempted to recapture claims that were rejected upon his intermediate application. This appears to be precisely what was done. The baffling arrangement disclosed by rejected claim 3 necessarily called for a restriction of the gas passage above the superheater. It provided a larger entrance for gases to the superheater than for their exit in the up-pass through the water tubes above the superheater. If, in his baffling arrangement, Pratt believed himself to have invented something worth while, it seems strange that it did not occur to him that the virtues of that feature of his invention resided in his original patent, as well as in his intermediate application, and that he did not then make an effort to correct the deficiencies of the first grant.

So far as I can see, the only possible novelty in the claims of the reissue patent over the rejected claims and the prior art is that the reissued claims are limited by the transversely extending bent superheater tubes, and, if bent tubes be construed to cover more than the curved superheater tubes shown by the Pratt specification, it is my opinion that his reissue patent is of doubtful validity.

[3] It is true that the Pratt intermediate patent is later, both in application and grant, than the original application for the patent that has been reissued. But that

fact, assuming the validity of the reissue, should not be permitted to control the Hell Gate boilers. Their erection, it must be remembered, was begun before the reissue was applied for, and one of them was completely installed before the patent was granted. The intervening right that then arose should, I think, even if infringement were found, save the defendants from the liabilities now asserted against them. American Automotoneer v. Porter, 232 F. 456, 463, 146 C. C. A. 450; Ashley v. Tatum (D. C.) 240 F. 979.

Plaintiff seeks to avoid the result that has been reached by urging that patent No. 1,274,327 was for a boiler composed of three groups or banks of water tubes, and that patent No. 1,206,246 (the original of the reissue) showed but two groups or banks; and that therefore rejected claim No. 10 of the intermediate patent could not have been made in the earlier filed application. Whatever may be said of claim 10, rejected claim No. 3 could have been made in that application. Had that claim been allowed in No. 1,274,327, there is little or no doubt that defendants would now be answering a charge of infringement to it, instead of defending against the reissue patent. There is nothing in rejected claim No. 3 to indicate that it was designed to cover a narrow specific form of the boiler shown in No. 1,206,246. On the contrary, the claim provided that the horizontally extending baffle should be supported on the lowermost row of tubes of said bank, viz. a bank of generating tubes above the secondary combustion chamber. It is hard to conceive of a single tier bank of tubes that can be said to have a lowermost row.

That infringement would here also be charged of rejected claim 8, had it been allowed, is little short of certain. I say this because it may plausibly be argued that the tubes of defendants' boilers are divided into three groups—one being over the primary combustion chamber and below the superheater, another between the horizontal baffle and the top of the superheater, and the third above the horizontal baffle.

Having come to the conclusion that the Pratt patent cannot support a decree, the alleged infringement of Bell patent, No. 1,141,520, remains for consideration. Here again the question of infringement is largely a matter of words. It depends upon the meaning to be ascribed to the word "pass" as used in the Bell claims; that is, does the superheater in the Hell Gate structure occupy a position within the first upward transverse pass of the patentee? Although the word "pass" is one of art, it has a variable meaning, and much argument has been made as to what it should be held to cover in this suit.

In determining the scope of a particular invention, there seems to me no better way of reaching a correct result than to interpret the terms of the claims in the sense in which they were used by the patentee.

As has heretofore been shown, Bell was afraid to subject the full length of the lower rows of water tubes of his boiler to the full sweep of the products of combustion from the furnace. To avoid doing so, he located his horizontal baffle immediately beneath the bottom row of lower bank of tubes. It extended about half way of the length of the tubes, where it connected with a vertically extending baffle. This latter, together with the opposite side of the boiler setting, formed the restricted area within which the first pass superheater is to be found.

There is, I think, no real doubt that Bell's intention was to confine his superheater to a pass substantially less than that through which the products of combustion were to flow upon leaving the grates. He particularly specified that the superheater should occupy less space than the full length of the water tubes. That certainly meant that the length of the superheater tubes should be substantially less than that of the water tubes. One thing he had in mind was the proportioning of "the gas passages to the temperature and volume of the gases which contract as they cool." He was aware that, as the gases passed over the heating surfaces of the unprotected portions of the lower bank of tubes, their temperature would be somewhat lowered. In order to permit the gases to have full contact with the superheater, and to enable it to extract a maximum amount of heat from the partially cooled products of combustion, Bell provided a restricted pass to increase the velocity of gas flow. Assuming equal inside dimensions for the Bell and Hell Gate boilers, the gases which would flow over a superheater located within the first upward pass of the Bell boiler would move with much greater velocity than the rate of flow at which the Hell Gate superheater is bathed. Defendants have done nothing to proportion the gas passage within which their superheater is located to the temperature and volume of the gases which lose a part of their heat in flowing through the lower bank of tubes.

In connection with the foregoing, it is of interest to note that Pratt was of opinion that a boiler, such as is shown by his patent

No. 1,274,374, possessed a quality which differentiated it from the result that Bell purported to secure. In support of that application of Pratt, it was argued to the Patent Office that the structure then under discussion was designed to provide a superheater for high superheats, and consequently the gases rise slowly through substantially the entire length of the lower group of water tubes, and then are given a much higher velocity by the cross baffling in the upper group of water tubes. If this Pratt boiler is to be differentiated from Bell in this particular, it is difficult for me to understand why defendants' boiler should not similarly be differentiated.

And, as bearing upon the question as to what constitutes a "pass" in a multiple pass boiler, attention may be directed to Jacobus patent No. 1,470,744, in which the advisory engineer of plaintiff points out a number of distinct advantages attributable to the nonobstruction by baffles of the lower bank of tubes. Not only does he do this, but he describes how, in the invention secured by his patent, "the gases," after being distributed " * * * so that they contact with the entire length of the lowermost tubes, are directed forwardly by the roof baffle and are made to flow into the lower part of the first pass, after which they flow through progressively decreasing areas throughout the boiler. * * *"

To my mind the significance of this statement is that the first pass of Jacobus is substantially the first pass of Bell; and that in 1918, when the former asked for his patent, and when there was no pending litigation, there was no confusion as to what, in the opinion of this eminent authority, constituted a "pass" in the art of boiler construction. To paraphrase the words of defendants' expert in defining the sense in which Bell used the term "pass," it is the portion of the boiler at the up-flow side of the inclined transverse baffle. That is the sense in which Jacobus used the term, and it is certain that the lower bank of tubes in the Jacobus patented boiler is not within his description of a "first pass." Some confirmation for the conclusion that in this art transverse passes are formed only by upright baffles, or by baffles and headers, is to be found in rejected claim 10 of Pratt patent, 1,274,327. It specified that the upper group of tubes should be equipped with transverse baffles dividing the same into a plurality of passes beginning at the steam intake ends of the tubes.

8 F.(2d)—40

According to Jacobus, an advantage to be secured by providing a free flow area for the products of combustion between the lowermost tubes and the proper number of tubes in the lowermost bank, is "that a lesser amount of slag will be deposited in the superheater, as a greater number of the fused particles of slag will be cooled in flowing through the spaces between the tubes to a degree that will cause them to be solidified before they come into contact with the superheater than would be the case with a smaller flow area and an insufficient number of rows of tubes. To secure good results, there should be at least four rows of tubes having at least twenty-five per cent. of the total heating surface of the entire boiler, and the lower bank should be unobstructed by baffles so as to provide a free flow area between the tubes and into the superheater chamber. The particular arrangement therefor makes it possible to keep the superheater free from slag and to maintain a more even degree of superheat than could be secured with a lesser flow area between the tubes of the lowermost bank and a lesser number of tubes in the lowermost bank."

The arrangement also avoids "a torchlike effect of the flames" upon the tubes. Once again, an engineer of the plaintiff company differentiates a feature of one of his patents from the disclosure made by Bell. By the same token, the defendants should have the benefit of a structure that is also differentiated from Bell, in the particulars just described by Jacobus.

What is known in the art as the Alert type of baffling will serve to increase gas velocity over such portions of boiler tubes as may be divided by a series of vertical baffles. It has long been known that to get efficiency, it is necessary to "crowd down" the passes to a certain extent. The obvious way of accomplishing this result is to incline the vertical baffles shown in the Alert type of bypassing water tubes. The effect of a particular angle of inclination is one upon which engineers cannot give a definite answer. All that can be said positively is that inclining a baffle will give a better result than not inclining it, but whether the benefit of inclination ceases at some angle or another was a matter not known to plaintiff's expert. He was, however, able to say that conditions in a boiler are constantly changing with its use, and that every time something is changed there is a change in something else, something, perhaps, that it was not wanted to change.

The net result of my examination of the facts of this case is that defendants have constructed a type of superheater water tube boiler that differs materially from those shown and claimed by the patents in suit, and that it is accomplishing results which, if they were contemplated by Pratt and Bell, are brought about by a construction that avoids any valid claim of infringement of the patents granted upon their inventions.

It follows that the complaint must be dismissed.